The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gardner and upon the telephone deposition of Dr. Christopher Brown. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
This case was heard before Deputy Commissioner Edward Garner, Jr., in Greensboro on July 21, 1992. By order filed July 28, 1992, the parties were given 45 days, until September 7, 1992, for the taking of medical depositions. On December 23, 1992, in response to further orders of the Deputy Commissioner, plaintiff's counsel wrote to advise that the deposition of the primary treating physician, who practices in northern Virginia, had been scheduled in August of 1992, within the original period allowed for the taking of such depositions, but that the deposition had been canceled on account of the defendant's refusal to pay the physician's fee for the deposition, which was substantially greater than the fees typically awarded by the Industrial Commission for physicians in North Carolina. In said letter, plaintiff's counsel solicited Deputy Commissioner Garner's suggestions for how to resolve the problem of getting the needed medical evidence and asked, if no other resolution was available, that the Deputy Commissioner order the defendants to pay for the deposition of the physician in question. The Deputy Commissioner never directly addressed the issues raised by that letter, other than to order the parties to attempt to resolve the problem. Ultimately, medical evidence was introduced through stipulation of records from Dr. D. W. Moore and Dr. Christopher Brown, though not all records from Dr. Brown were introduced. Contentions were filed, and Deputy Commissioner Garner filed his Opinion and Award on February 9, 1994, denying Ms. Miller's claim on grounds that there was no causal connection between her original compensable injury and subsequent treatment and disability for which she claimed benefits. Ms. Miller filed timely notice of appeal to the Full Commission. This matter first came before the Full Commission on 13 June 1994. As a result of that review the Commission ordered on 2 February 1995 that the parties take the deposition of Dr. Brown, that the plaintiff pay any advance deposition costs charged, with the payment of the final bill pending the ultimate outcome of the case. After the deposition was completed, the case again came before the Full Commission on 30 May 1995 as aforesaid.
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between the plaintiff and the defendant-employer.
3. Plaintiff's average weekly wage was $268.93, which yields a compensation rate of $191.30.
4. The Maryland Casualty Insurance Company was the compensation carrier on the risk.
5. Plaintiff suffered an injury by accident on May 27, 1989 resulting in an injury to the knee.
6. The defendant-employer admitted liability and accepted this case as a medical only case.
7. The issue to be determined is whether plaintiff's present medical problem is related to the original injury by accident of May 27, 1989.
*************
Based upon all of the competent evidence in the record, the Full Commission makes the following:
FINDINGS OF FACT
1. Plaintiff was employed by defendant-employer on May 27, 1989. On that date, she struck her knee on a piece of metal holding a ladder to the side of her truck and caused injury to the knee. She last worked for the defendant-employer on June 1, 1989. The injury occurred when Ms. Miller was climbing up the ladder-like steps on the side of her dump truck to push some brush back into the truck, in muddy conditions, and her foot slipped off of a metal rung, causing her left knee to slam into the metal bracket that held the rung to the truck. (T pp. 4-6) After trying to work for another day or two, she went to Dr. D. W. Moore, who treated her conservatively. On June 2, 1989, Dr. Moore took Ms. Miller out of work until June 7, 1989, when she was to be rechecked. (T pp. 9-10, Exhibit pp. 16-18) Dr. Moore found crepitus and tenderness, and x-rays were negative. (T Exhibit pp. 17, 19)
2. At the end of the initial period that Dr. Moore authorized her to be out of work, Ms. Miller did not return to work for the employer, choosing instead to care for sick parents. (T p. 10) There is no indication as to whether Dr. Moore would have continued to keep her out of work if she had asked, and Ms. Miller does not claim compensation for the period immediately following June 7, 1989. Starting in July of 1989, Ms. Miller returned to work driving a dump truck for a succession of other companies, earning as much as or more than she had earned from the employer-defendant. (T pp. 10-12) However, while she was working for these other companies, she had constant problems with pain and giving way of her knee. (T pp. 32-36) This had prompted her to purchase and use a knee brace, in an effort to reduce the episodes of giving way. (T p. 38) On or about May 13, 1990, while she was working for Stringfellow Trucking, her knee gave way spontaneously, and she fell to the ground, injuring her knee. (T pp. 36-37, Exhibit p. 5) Thereafter, she sought treatment at the local emergency room, then came under the care of Dr. Christopher Brown, an orthopaedic surgeon who ultimately performed surgery on her knee. (T pp. 37, Exhibit pp. 5-15) After surgery, she was kept out of work from the date of her surgery on June 8, 1990 until July 19, 1990 (Stipulated medical records, operative note of 6/8/90, office notes of 7/10/90 and 8/7/90) Ms. Miller testified that she suffered some temporary disability, in the form of reduced wages, for a couple of months after her return to work, but this is difficult to calculate precisely, as she freely admitted that approximately 50% of the missed work during that period could be attributed to inclement weather. (T pp. 16-28) Dr. Brown ultimately assigned ratings of 25%, then 20% of Ms. Miller's left leg. (Stipulated medical records, 1/23/92, 7/2/92) Ms. Miller's testimony and Dr. Brown's records show that she has continued to have significant problems with her knee. (T pp. 39-40; Stipulated medical records 6/26/92 and 7/2/92)
Plaintiff moved to Virginia and defendant-employer never heard anything else from plaintiff until they began receiving medical bills for treatment which occurred on and after May 15, 1990.
3. After plaintiff left the defendant-employer, she began working with several other trucking companies on a full-time basis.
4. On May 15, 1990, plaintiff saw Dr. Brown in Virginia. His medical notes indicate that plaintiff saw him and complained of twisting her knee while on the job on May 13, 1990, almost a year after she left the employment of defendant employer. Plaintiff testified that on 13 May 1990 her knee just gave way. "I had got out of the truck and I went to the back and went to step around. And then I come down on it. This time my whole body come down. There was nothing for me to catch." She further testified that she did not step on anything or slip on anything or trip on anything; that there was nothing abnormal about the step; that her knee simply gave way and dropped her to the ground. (Tr pp. 36-37). She went to the emergency room and two days later went to Dr. Brown on referral from the emergency room. Based upon the testimony of the plaintiff and the Deposition testimony of Dr. Christopher Brown, the Full Commission finds that the incident of 13 May 1990 was caused by the prior injury of 27 May 1989.
5. On deposition, Dr. Brown testified that when he examined her on 15 May 1990 "she was having anterior knee pain on the left and had a history of twisting her knee on the job." He said the plaintiff described the May 13 incident "as giving way and primarily anterior knee pain around the patella." (Depo. P 7) He said he examined her left knee, the knee originally injured on 27 May 1989 in the employ of Defendant T.B. Doggett Construction Company. "She came in with a knee immobilizer on, which is a brace, and we took that off. And she had noted that she had a limp on that side, and there was an amount of what we call effusion, which is extra fluid within the knee. There was also tenderness of the medial side of her patella, and when we compressed the patella against her femur, it caused pain, and that usually indicates there's some kind of injury to the underside of the patella." (Depo. p 8) His examination also determined that the Plaintiff had atrophy of the vastus medialis obliques — one of the muscles in the quadriceps that attaches to the supramedial border of the patella. He testified that this atrophy could not have been the result of the incident that occurred two days before his examination but would have had to have been some time before. When this muscle is atrophied, it means that there has been an injury — that the patient is not using the knee normally, and the muscle starts to atrophy. His working diagnosis was post traumatic chondromalacia of the patella — damage to the coating cartilage, or articular cartilage, on the underside of her knee cap. Dr. Brown and his partner treated plaintiff conservatively (Ibuprofen and exercise), but determining there had been no improvement, recommended arthroscopic surgery, which was performed on 8 June 1990. Surgery determined the patient was suffering with moderate to severe chondromalacia. "We were able to smooth out the edges, and I tried to contour down the cartilage to make it as smooth as possible so that she would then have better function of the knee. But with the kind of findings that I saw in there, she had the damage in the worst possible area, which is in the inferior half of the knee cap, because that's where a lot of the pressure is taken up on bending and straightening the knee." (Depo. P 14) In addition to smoothing out the underside of the knee cap, Dr. Brown performed an arthroscopic lateral release. "When you have the atrophy, then the muscle that we talked about before, the vastus medialis obliques, the patella, because it cannot tolerate the kind of pressure that she has in the knee now, we loosen up the structure on the other side of the knee, opposite the medial side. On the lateral side, there's something called the lateral retinaculum, which could be tight, and we cut through that, and that's a release when you do that. And it basically heals back, but it heals back a little bit looser and takes some of the pressure off the knee cap." Dr. Brown permitted plaintiff to return to work on 19 July 1990. He rated her with a 20% permanent partial disability of the left knee. He also testified that there was more than a 50% chance that she eventually would have to have another operation on her left knee. (Depo. P 23) He testified that the plaintiff continued, more than a year after the arthroscopic surgery, to have "`giving way episodes', where for no reason you're walking along and the quadriceps just stops working for a second and your leg starts to collapse on you. Some people fall down, some people catch themselves, but that's a giving way episode. . . . We think it has to do with the way the patella rides in the groove at the end of the femur. If it just slides slightly out of place, it can trigger a reflex that makes the muscles go limp." (Depo. p 28) Dr. Brown's expert medical opinion as an orthopaedic surgeon was that the condition for which he treated the plaintiff in May of 1990 was caused by her initial injury on 27 May 1989 (Depo. P 35) and the Full Commission so finds as a fact that the 27 May 1989 compensable injury by accident did cause such condition. He further testified that in cases like the 27 May 1989 knee injury, sometimes the person's knee will get bad enough that it will collapse on them and they will need to have surgery such as he performed on 8 June 1990. (Depo. pp 53-60).
6. As a result of the 27 May 1989 compensable injury, plaintiff was out of work from 8 June 1990 through 19 July 1990, for which she is entitled to compensation from defendants of $191.30 per week. Because of the injury she was also out of work for 50% of the time for a 2-1/2 month period for which she is entitled to compensation.
7. As a result of the 27 May 1989 compensable injury, plaintiff had to incur medical bills necessary to effect a cure, give relief or enable her to return to work.
8. As a result of the 27 May 1989 compensable injury, plaintiff is entitled to a 20% permanent disability rating to her left leg, entitling her to 40 weeks of compensation at $191.30 per week.
*************
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
CONCLUSIONS OF LAW
1. As a result of the admittedly compensable injury by accident plaintiff sustained on 27 May 1989, plaintiff sustained an injury to her knee which causes her leg to give way. Her leg gave way on 13 May 1990 as a result of the accident sustained on 27 May 1989 and plaintiff required surgery and other medical treatment.
2. Plaintiff is entitled to temporary total disability compensation benefits at the rate of $191.30 per week, commencing 8 June 1990 and continuing through 19 July 1990 and is entitled to one-half of 2 and 1/2 months of temporary total disability compensation benefits at the rate of $191.30 per week. Based on the 20% rating to her left leg by Dr. Christopher Brown, plaintiff is entitled to 40 weeks of compensation at $191.30 per week.
3. Plaintiff is entitled to have defendants provide all medical treatment arising from this injury by accident to the extent the treatment tends to effect a cure, give relief or lessen her disability. N.C. Gen. Stat. § 97-25.
*************
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
AWARD
1. Plaintiff is entitled to compensation from Defendants at the rate of $191.30 per week from 8 June 1990 through 19 July 1990 and to one-half of 2-1/2 months of compensation at the same rate as well as 40 weeks of compensation at the same rate, the latter for a 20% rating of her left leg. Defendants shall pay to plaintiff interest, pursuant to the terms of N.C.G.S. § 97-86.2 on such award from 21 July 1993 until paid. Such amounts shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred, or to be incurred, by plaintiff as a result of this injury by accident, including the expenses incurred in treatment by Dr. Christopher Brown and his associates. N.C.G.S. 97-25.
3. An attorney's fee in the amount of twenty-five percent of the compensation awarded herein is hereby approved for plaintiff's counsel, which shall be deducted from the accrued benefits and paid directly to plaintiff's counsel.
4. Defendants shall pay to plaintiff's counsel the deposition costs of Dr. Christopher Brown advanced by plaintiff's counsel and any other deposition costs of Dr. Christopher Brown directly to Dr. Brown.
5. Defendants shall pay all other costs in this matter.
 S/ __________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ __________________ DIANNE C. SELLERS COMMISSIONER
S/ __________________ COY M. VANCE COMMISSIONER